IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **CYNTHIA MANSKER,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil No. 09-179-WDS-CJP** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT and RECOMMENDATION

This Report and Recommendation is respectfully submitted to District Judge William D. Stiehl pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Cynthia Mansker seeks judicial review of the final agency decision finding that she is not disabled and denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to **42 U.S.C. § 423**.

## Procedural History

Plaintiff filed an application for DIB and SSI in July, 2005, alleging disability beginning on July 5, 2005.[1]  The application was denied initially and on reconsideration.  At plaintiff's request, a hearing was held before Administrative Law Judge (ALJ) M. Kathleen Gavin on August 22, 2007.  ALJ Gavin denied the application for benefits in a decision dated April 7, 2008.  Plaintiff's request for review was denied by the Appeals Council, and the April 7, 2008,

---

[1]The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 1382, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  For all intents and purposes relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925, detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Thus, plaintiff's DIB and SSI claims will be considered simultaneously, and most citations are to the DIB regulations out of convenience.

decision became the final agency decision.  (Tr. 1-3).

Plaintiff has exhausted her administrative remedies and has filed a timely complaint in this court.

## Issues Raised by Plaintiff

Plaintiff filed a motion for summary judgment at **Doc. 25.**  In her memorandum in support, **Doc. 26**, she raises four issues:

(1)     Whether the ALJ's Residual Functional Capacity Assessment was supported by substantial evidence;

(2)     Whether the ALJ erred in weighing the medical opinions;

(3)     Whether the ALJ's finding that plaintiff could return to her past relevant work was faulty because she did not determine the specific requirements of that past work; and

(4)     Whether the ALJ erred in her determination of plaintiff's credibility.

## The Evidentiary Record

This Court has reviewed and considered the entire record in formulating this Report and Recommendation.  The following is a summary of some of the pertinent portions of the written record.

**1.     Plaintiff's Testimony**

The evidentiary hearing took place on August 22, 2007.   Plaintiff was represented at the hearing by attorney Larry Gibson. (Tr. 9).

Plaintiff graduated from high school.  She was about 5 feet tall and weighted about 125 pounds.  Her last job was as a machine operator at Little Fuse from 1994 through 2001.  (Tr. 24). She did not have to lift much weight, and could sit or stand on that job.  Before that, she worked as a warehouse inventory clerk.  (Tr. 25).

Plaintiff was not wearing her hearing aids at the hearing because they were broken.

Plaintiff testified that she is unable to work because she "get[s] out of breath real easy." She was unsure of her diagnosis.  She uses inhalers.  (Tr. 28).   Plaintiff testified that she gets short of breath after walking only 1 block.  Putting clothes in the washer and transferring them to the dryer causes her to become short of breath.  (Tr. 29).  In addition, her knees and low back hurt.  (Tr. 30).  She was diagnosed with diabetes in 2005.  Plaintiff testified that she has difficulty controlling her blood sugars, and that her readings are usually close to 200.  (Tr. 32).

With regard to her daily activities, Ms. Mansker testified that she doesn't do much.  She washed dishes, watches television, and lays on the couch.  Her daughter does her housework and grocery shopping.  (Tr. 33).

She smokes, but is trying to quit.  (Tr. 30).

**2.** **Vocational Expert**

Dr. Bordieri testified as a vocational expert.  Plaintiff had no objections to his qualifications.  (Tr. 23).

The VE testified that plaintiff's past work at Little Fuse was light, unskilled.  Her work as a warehouse clerk was light and semi-skilled.  In that job, she did data entry; that skill would transfer to a data-entry clerk position, which is sedentary and semi-skilled. There are about 16,000 such jobs in the regional economy. Asked to assume a person who could perform light work but avoid exposure to fumes and loud noises, the VE testified that she could perform her past work.  Asked to assume a person who could do sedentary work, the VE testified that she could perform the data entry clerk position.  (Tr. 37).  If her condition required her to miss more than 2 days a month from work, she would not be able to sustain employment in the competitive labor market.  (Tr. 38).

**3.** **Medical Records**

Plaintiff was diagnosed with diabetes on July 5, 2005, the date on which she alleges she became disabled.  The diagnosis came after she went to the emergency room at St. Marry's Good Samaritan Hospital in Centralia, Illinois, complaining of weight loss, fatigue and excessive urination.  She was started on insulin.  (Tr. 213).  She was 48 years old at the time.  The hospital records indicate that she had a history of hypertension, for which she was not taking any medication, and that she had been told "she has mild obstructive pulmonary disease from history of smoking."  On examination, she had no cough or shortness of breath.  (Tr. 215).  A chest x-ray taken on July 5, 2005, showed clear lungs with no pleural effusion.  (Tr. 232).

Ms. Mansker returned to the emergency room on October 13, 2005.  She had fallen while intoxicated a few days prior, and was having headaches.  A CT scan of the head and face showed no fractures.  (Tr. 266-270).

On December 27, 2005, plaintiff became unconscious after taking her insulin but failing to eat.  She was taken to the emergency room at St. Mary's.  The diagnosis was reactive hypoglycemia.  She was advised not to skip meals.  (Tr. 257-261).

Dr. Jeffrey Kerr of Southern Illinois Healthcare Foundation followed Ms. Mansker for her diabetes.  His records contains lab results of hemoglobin A1C tests which indicate that Ms. Mansker's blood sugars were well-controlled.  According to the website of the National Institutes of Health, the A1C test reflects the patient's average blood sugar level for the past 2 to 3 months.  Patients with diabetes should aim for an A1C level of 7 percent or less, which reflects good control of blood glucose levels.  *See, www.nim.nih.gov/medlineplus/ency/article/003640, accessed on January 19, 2011.*  In October, 2005, a few days after plaintiff fell while intoxicated, his records indicate that her diabetes was "uncontrolled," and he increased her insulin.  (Tr. 302). In December, 2005, plaintiff's A1C result was 6%.  (Tr. 306).  In April of 2007, the doctor's

-4-

note describes her diabetes as "uncontrolled" but he also noted that her A1C level was 7.1 and did not change her therapy.  She stated that she was not was eating what she was supposed to. He also noted that she continued to smoke, and counseled her regarding same.  (Tr. 318).  In July, 2007, her A1C was again 7.1.  (Tr. 326).

The medical records also reflect that plaintiff has a history of chronic obstructive pulmonary disease (COPD).  Dr. John Coe performed a consultative exam on September 6, 2005. He noted that she had "mild obstructive lung disease" and was using a Combivent inhaler.  (Tr. 239).  She had a "chronic cigarette cough."  Her lungs were clear, with "somewhat distant breath sounds," but no rales or rhonchi.  (Tr. 240).

A chest x-ray in December, 2005, showed "no active pulmonary disease."  (Tr. 287).  On March 28, 2007, plaintiff reported to Dr. Kerr that her breathing was worse for the last 2 or 3 months, but he noted that she was "still not interested in smoking cessation."  On exam, she had "fair air movement."  (Tr. 338).  Dr. Kerr ordered a chest x-ray, which was done at St. Mary's on March 29, 2007.  The results were "Lungs are clear.  Heart size is normal.  No pulmonary vascular congestion or pleural effusion."  (Tr. 329).

On April 27, 2007, Dr. Kerr noted that she had COPD and was on Advair.  She complained of shortness of breath, wheezing and cough for the past 3 months.  He also noted that she continued to smoke.  On exam, she had wheezing, but no crackles.  (Tr. 336).

On October 9, 2007, Dr. Raymond Leung performed a consultative examination.  Ms. Mansker complained of shortness of breath and occasional coughing and wheezing.  The doctor noted that she had been smoking for 30 years and that she was using 3 inhalers.  She had never been hospitalized or seen in an emergency room for her breathing.  (Tr. 353).  On exam, she had decreased breath sounds bilaterally, but no crackles or wheezes.  The expiratory phase was normal.  She was described as "in no respiratory distress."  (Tr. 255).  He performed a

spirometry test, which measures exhaled air flow, with a result of "borderline obstruction."  (Tr. 367).

Ms. Mansker also has some hearing loss.  Dr. Wallace Berkowitz performed a consultative exam on September 8, 2005.  She had a "long-standing history of hearing loss." after testing, Dr. Berkowitz concluded that she had "bilateral sensori-neural hearing loss with some element of a mixed hearing loss in the left ear.  The patient's speech and understanding is excellent."  (Tr. 236).  The notes on the test results page indicate that plaintiff had 2 hearing aids, but was not wearing the left one because it was broken, and her "aided responses" were within the mild to moderate limits.  (Tr. 237).  Dr. John Coe performed a consultative exam the next day.  He noted that she was supposed to have hearing aids, but was only wearing the one on the right, and that her hearing was "somewhat poor."  The doctor stated that he had to repeat things, but she could understand him if he spoke loud enough and she was able to speak without difficulty.  (Tr. 240).

Dr. Coe also noted that plaintiff has had poor vision since the 1980's, but that she had glasses that worked well for a while.  At the time of the exam, her vision was blurry, but she was unable to afford new glasses.  (Tr. 239).

Ms. Mansker also has arthritic changes in her fingers.  In September, 2005, Dr. Coe noted that she had "arthritic hands but they don't give her much pain at this time."  Although she had "rather marked distal osteoarthritic changes in her fingers." the doctor noted that her hands were fully functional.  (Tr. 240).  At the time of Dr. Leung's exam in October, 2007, she was able to pick a penny up off the table with both hands.  (Tr. 354).  She had "anywhere from mild to severe Heberden's nodes in her hands."[2]  All joints showed full range of motion, and her grip

---

[2]"When osteoarthritis involves the hands, small, bony knobs may appear on the end joints (those closest to the nails) of the fingers. They are called Heberden's (HEBerr-denz) nodes."

strength was 5/5.  (Tr. 355).  Ms. Mansker also told Dr. Leung that she had arthritis in her back,

but he noted that she had a full range of motion in her spine.  (Tr. 356).  He opined that she

should be limited to only occasional handling and fingering due to arthritis in her hands.  (Tr.

361).

**4.       RFC Evaluations**

A state agency physician evaluated plaintiff's RFC, and concluded she could do medium

exertional activities.  (Tr. 242-249).  As the ALJ gave the evaluation little weight, it is not

necessary to describe it in detail.  See, Tr. 17.

Plaintiff's treating doctor, Dr. Kerr, completed a Statement of Ability to do Work-Related

Activities on June 5, 2007.  (Tr. 320-323).  He opined that she could frequently lift less than 10

pounds, occasionally lift less than 10 pounds, stand or walk for less than 2 out of 8 hours, sit

with normal breaks for less than 6 out of 8 hours, and push/pull limitations in both the upper and

lower extremities.  These limitations were expressly based on plaintiff's reports.  (Tr. 321). She

was limited to only occasional performance in all postural categories. Dr. Kerr's explanation for

this was that "dizziness, knee pain and back pain limit each of the postural activities, according

to Cynthia." (Tr. 321).  In the category of manipulative limitations, the only limitation noted was

in handling (gross manipulation).  In all other areas (reaching, fingering and feeling) she was

unlimited.  (Tr. 322).  He also recommended limitation of exposure to environmental irritants

such as  noise, dust fumes and temperature extremes.  (Tr. 323).

Dr. Raymond Leung assessed plaintiff's RFC on October 9, 2007.  (Tr. 359-364).  He

found that plaintiff could frequently lift up to 10 pounds, occasionally lift less than 11-20

pounds, stand 4 out of 8 hours, walk for 1 out of 8 hours, and sit for 8 out of 8 hours.  The

---

http://www.niams.nih.gov/Health_Info/Osteoarthritis, accessed on January 19, 2011.

restrictions were based on her complaints of back pain.  (Tr. 360).   Dr. Leung also found that

Ms. Mansker was limited to only occasional handling, fingering and push/pull because of

arthritis in her hands.  (Tr. 361).  He found that she also has hearing limitations and cannot use a

telephone to communicate.  (Tr. 362).  Despite these limitations, Dr. Leung opined that plaintiff

could do a number of activities, including shopping, walking a block on uneven areas, and

sorting and using paper files.  (Tr. 364).

**Applicable Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the

applicable statutes.  For these purposes, "disabled" means the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  **42 U.S.C. §§ 423(d)(1)(A) and**

**1382c(a)(3)(A).**  A "physical or mental impairment" is an impairment resulting from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques.  **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a

claimant is disabled.  In essence, it must be determined (1) whether the claimant is presently

employed; (2) whether the claimant has an impairment or combination of impairments that is

severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged

to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5)

whether the claimant is capable of performing any work within the economy, given his or her

age, education and work experience.  **See,** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir.**

**1992);** *Pope v. Shalala*, **998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the Commissioner finds that the claimant has an impairment which is severe and she is

-8-

not capable of performing her past relevant work, the burden shifts to the Commissioner to show

that there are a significant number of jobs in the economy that claimant is capable of performing.

See, *Bowen v. Yuckert*, **482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** *Knight v. Chater*, **55**

**F.3d 309, 313 (7th Cir. 1995).**

It is important to keep in mind the proper standard of review for this Court.  "The

findings of the Commissioner of Social Security as to any fact, if supported by substantial

evidence, shall be conclusive. . . ."  **42 U.S.C. § 405(g).**   Thus, the Court must determine not

whether Ms. Mansker is, in fact, disabled, but whether ALJ Gavin's findings were supported by

substantial evidence; and, of course, whether any errors of law were made.  **See,** *Books v.*

*Chater*, **91 F.3d 972, 977-978 (7th Cir. 1996) (citing** *Diaz v. Chater*, **55 F.3d 300, 306 (7th**

**Cir.1995)).**

In reviewing for substantial evidence, this Court uses the Supreme Court's definition, that

is, "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, **402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).**  Further,

the entire administrative record is taken into consideration, but this court *does not* reweigh

evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for

that of the ALJ.  *Brewer v. Chater*, **103 F.3d 1384, 1390 (7th Cir. 1997).**

## Analysis

Here, the ALJ properly followed the five step analysis.  She concluded that plaintiff does

have severe impairments of diabetes, bilateral hearing loss, mild osteoarthritis in the hands, mild

COPD, and rule out peripheral vascular disease, and that these impairments do not meet or equal

a listed impairment.  (Tr. 11-13).  Ms. Mansker does not challenge the finding that her condition

does not meet or equal a listed impairment.

The ALJ found that plaintiff's testimony about the intensity, duration, and limiting

effects of her symptoms were not entirely credible.  (Tr. 14).

The ALJ gave greater weight to Dr. Leung's RFC assessment than to Dr. Kerr's

assessment because there was no objective evidence to support the restrictions found by Dr.

Kerr, and because most of the restrictions were explicitly based on Ms. Mansker's subjective

complaints.  (Tr. 16).  The ALJ determined that plaintiff retains the ability to perform light work

as defined by 20 C.F.R. 404.1567(b), except that she should avoid exposure to respiratory

irritants and loud noises.  (Tr. 13).

In accordance with the testimony of the vocational expert, the ALJ found that Ms.

Mansker is able to perform her past work as a machine operator/assembler and as an inventory

clerk.  (Tr. 18).

Plaintiff's first point is that the ALJ's determination of her RFC was faulty because it did

not take into account all of her impairments.  Plaintiff argues that the ALJ failed to include

limitations arising from arthritis in her hands, diabetes, pain in knees and back, hearing loss,

depression and anxiety and impaired vision.  This point dovetails with plaintiff's fourth point,

which is that the ALJ did not properly assess her credibility.

Plaintiff's attack on the RFC determination assumes that the evidence establishes that she

has functional limitations caused by the impairments she lists.  This is not true.  The ALJ

explained the evidentiary basis for her determination that these impairments cause little or no

functional limitations.  For instance, the ALJ explained that the evidence established that

plaintiff's hearing loss and vision impairment are correctable and therefore do not present

functional limitations.  (Tr. 14-15).  The ALJ stated that "the evidence reveals few functional

limitations" related to plaintiff's diabetes.   In her brief, plaintiff argues that her diabetes causes

fatigue.  As support, she cites to the St. Mary's records from the admission during which her

diabetes was first diagnosed.  See, Doc. 26, p.6.  This shows only that fatigue was a symptom of

her untreated diabetes.  Plaintiff points to no evidence in the record that she continued to suffer from fatigue after she began treatment.  The ALJ explained at length why she did not assign any functional limitation arising from depression or anxiety at Tr. 11-13.  While the ALJ accepted that Ms. Mansker has arthritis in her hands, she detailed the evidence, including the examinations of both Dr. Coe and Dr. Leung, which indicated that her arthritis does not cause her much pain or limit the use of her hands.  (Tr. 15, 17).  In addition, the ALJ relied on the plaintiff's own statements in the daily living questionnaire in which she indicated that she could use her hands.  (Tr. 15).

The Court notes that Ms. Mansker herself did not attribute her disability to hearing loss, vision impairment, arthritis in her hands, or depression and anxiety.  She testified that she could not work because of shortness of breath and pain in her back and knees.  (Tr. 28-30).  The ALJ did not fully credit these statements.  As to the complaints of disabling pain in her back and knees, the ALJ noted that no doctor ever found any objective basis for these complaints.  Dr. Coe stated she had no tenderness and a full range of motion.  Dr. Leung also found a full range of motion.  Dr. Leung also found there was no atrophy, normal strength and normal gait. (Tr. 15-17).

The ALJ discounted plaintiff's complaints of severe shortness of breath based on the repeated notations in doctors' records that she continued to smoke and was not interested in quitting.  The ALJ reasoned that, if her breathing difficulties were as severe as she claimed, she would have tried to quit smoking.  (Tr. 14).  In addition, while she had been diagnosed with COPD, her lungs were clear on x-ray.

Relying on information from the website "Google Health," plaintiff argues that the ALJ misunderstood the nature of COPD.  She argues that a person with COPD can still have clear x-rays, and that the best test for  COPD is spirometry.  This argument misses the mark.  The ALJ

did not say that a clear chest x-ray means that plaintiff does not have COPD.  Rather, she

properly regarded the clear chest x-rays as indicators that her COPD does not cause the very

severe shortness of breath testified to by plaintiff.  In any event, a spirometry test was done as

part of Dr. Leung's examination, and it showed only  "borderline obstruction."  (Tr. 367).

Similarly, plaintiff argues that the ALJ's observation about plaintiff continuing to smoke

again reveals a misunderstanding of the disease because quitting smoking will not cure COPD.

This argument borders on the fanciful.  The linkage between plaintiff's COPD and smoking

cessation was not introduced by the ALJ.  The two were linked by the doctors who treated and

examined her.  It is clear that all of the doctors who opined about her condition found it

significant that she continued to smoke, which reasonably suggests that continuing to smoke will

likely effect the severity of plaintiff's COPD.  Therefore, plaintiff's reliance on ***Rousey v.***

***Heckler*, 771 F.2d 1965 (7ᵗʰ Cir. 1985)** is misplaced.  In that case, there was no evidence that the

plaintiff's chest pains were connected to her smoking.  Therefore, it was illogical for the ALJ to

connect the two.  **See, *Rousey*, 771 F.2d at 1070.**  Here, it was entirely logical for  the ALJ to

connect COPD with continuing to smoke because the two were connected by the medical

opinions.  It was not error for the ALJ to conclude that the fact that plaintiff refused her treating

doctor's efforts to interest her in quitting was an indication that her shortness of breath was not

as severe as she claimed.

The credibility findings of the ALJ are to be accorded deference, particularly in view of

the ALJ's opportunity to observe the witness.  ***Powers v. Apfel*, 207 F.3d 431, 435 (7ᵗʰ Cir.**

**2000).**  Social security regulations and Seventh Circuit cases "taken together, require an ALJ to

articulate specific reasons for discounting a claimant's testimony as being less than credible, and

preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the

objective medical evidence and the claimant's testimony as a basis for a negative credibility

finding." *Schmidt v. Barnhart*, **395 F.3d 737, 746-747 (7ᵗʰ Cir. 2005), and cases cited therein**.

Plaintiff has not demonstrated any error with regard to the credibility findings.  As the ALJ's

credibility findings were not "patently wrong," they should not be overturned.  *Powers v. Apfel*,

**207 F.3d 431, 435 (7ᵗʰ Cir.2000).**

The ALJ's findings as to plaintiff's RFC are supported by substantial evidence in the

record.  She put forth a sufficient analysis of the evidence, and she set out a logical explanation

of her conclusions about how plaintiff's symptoms limit her ability to work.  This is legally

sufficient.  *Kasarsky v. Barnhart*, **335 F. 3d 539, 543 (7ᵗʰ Cir. 2003)**.

Plaintiff also complains about the weight the ALJ assigned to the respective doctors'

opinions in that she gave greater weight to the examining doctors and less weight to the opinion

of her treating doctor.

A treating physician's opinion is, of course, not automatically entitled to controlling

weight.  Such an opinion is entitled to controlling weight only where it is supported by medical

findings and is not inconsistent with other substantial evidence in the record.  *Clifford v. Apfel*,

**227 F.3d 863 (7ᵗʰ Cir. 2000);** *Zurawski v. Halter*, **245 F.3d 881 (7ᵗʰ Cir. 2001).**

With regard to the assessment of treating source opinions, **20 C.F.R. §404.1527(d)(2)**

states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. [emphasis added]

The opinions of treating doctors "on the nature and severity of your impairment(s)" may

be given controlling weight under Section 416.927(d).  However, medical opinions of treating

doctors regarding RFC are *not* given any special weight because the issue of RFC is an issue that

is reserved to the Commissioner.  See, 20 C.F.R. §416.927(e).  SSR 96-59 explains:

> However, treating source opinions on issues that are reserved to the Commissioner are
> never entitled to controlling weight or special significance. Giving controlling weight to
> such opinions would, in effect, confer upon the treating source the authority to make the
> determination or decision about whether an individual is under a disability, and thus
> would be an abdication of the Commissioner's statutory responsibility to determine
> whether an individual is disabled.

SSR 96-5p, at *2.

ALJ Gavin quite properly observed that the rather severe limitations set forth in Dr.

Kerr's RFC assessment were contradicted by the objective findings in his own records.  Further,

Dr. Kerr stated explicitly that he was basing the limitations on plaintiff's own statement as to her

limitations.  It was not error for the ALJ to discount his RFC assessment. **See, *Ketelboeter v.***

***Astrue*, 550 F.3d 620, 625 (7ᵗʰ Cir. 2008).**

Plaintiff also complains that the ALJ only accepted part of Dr. Leung's opinion as to her

limitations.  However, no regulation or Social Security Ruling requires an ALJ to adopt a

doctor's assessment in its entirety.  On the contrary, SSR96-8p instructs that the "RFC

assessment must be based on *all* of the relevant evidence in the case record," including medical

history, medical signs and laboratory findings, effects of treatment, reports of daily activities, lay

evidence, medical source statements, etc.  SSR96-8p, at *5 (emphasis in original).

The assessment of RFC is an issue which is reserved to the Commissioner.  20 C.F.R.

404.1527(e); SSR 96-5p, at *2.  Pursuant to Section 404.1527(e)(2), the Commissioner considers

evidence from medical sources in determining RFC, but "the final responsibility for deciding

these issues is reserved to the Commissioner."  Therefore, the Court rejects plaintiff's complaint

that the ALJ's RFC assessment is not entirely consistent with the assessment of any of the

doctors.

The ALJ explicitly noted that Dr. Leung's exam showed that Ms. Mansker had normal grip strength, was able to grasp and hold things, and could pick a penny up off the table with both hands.  Despite these findings, Dr. Leung assigned some limitations in her ability to use her hands.  The ALJ was not required to accept these limitations, and she gave a sufficient explanation for why she did not accept that Ms. Mansker has functional limitations in the use of her hands.

Lastly, plaintiff argues that the ALJ failed to obtain enough information about the requirements of her past relevant work related to use of her hands.  However, because the ALJ's finding that plaintiff has no functional limitations in the use of her hands is sufficiently supported by the record, there was simply no requirement that she investigate this issue in any greater detail.

In her reply brief, plaintiff argues that the agency lawyers are improperly defending the agency's decision on grounds not relied upon by the ALJ, citing **Parker v. Astrue**, **597 F.3d 920, 922 (7ᵗʰ Cir. 2010)**.  See, **Doc. 32.**   The citation to **Parker** is of no relevance here, as this Court has reviewed the ALJ's decision based on the evidence and analysis set forth therein.

### Recommendation

After careful consideration, this Court is convinced that the decision of the ALJ is supported by substantial evidence in the record as a whole, and that no errors of  law were made.  Therefore, this Court recommends that plaintiff's Motion for Summary Judgment **(Doc. 25)** be **DENIED**, and that the final decision of the Commissioner of Social Security, finding that plaintiff Cynthia Mansker is not disabled, be **AFFIRMED.**

Objections to this Report and Recommendation must be filed on or before **February 10, 2011.**

**Submitted: January 24, 2011.**


          **s/ Clifford J. Proud**
          **CLIFFORD J. PROUD**
          **UNITED STATES MAGISTRATE JUDGE**